UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| VS. | § | |
| | § | |
| JESUS GUADALUPE COVARRUBIAS | § | CRIMINAL NO. 5:21-CR-1627-1 |
| | § | |
| JOSE GERARDO ARMARO, JR. | § | CRIMINAL NO. 5:21-CR-1627-2 |
| | § | |
| ALEJANDRO RENE SANCHEZ | § | CRIMINAL NO. 5:21-CR-1627-4 |

## GOVERNMENT'S SUPPLEMENTARY RESPONSE TO MOTIONS TO SUPPRESS

The United States of America, by and through Jennifer B. Lowery, United States Attorney for the Southern District of Texas, and the undersigned Assistant United States Attorney, herein files the following supplementary response to the motions to suppress, previously filed by Defendants Jesus Guadalupe Covarrubias (1), Jose Gerardo Amaro, Jr. (2), and Alejandro Rene Sanchez (4).

On April 4, 2022, the Court ordered the parties to supplement the factual record with the time in which Roberto Carlos Zamora was first placed into a patrol car. Dkt. No. 255. The Court further ordered that the supplementary response address two issues: (1) whether or not there was probable cause to believe that a criminal offense had been, or was being, committed, prior to any alleged statements by Jose Gerardo Amaro, Jr. during the search of the gun safe; and (2) whether or not law enforcement officers exceeded to scope of Jesus Guadalupe Covarrubias' consent to search his residence. *Id*. The Government and defense previously filed a joint supplementary response showing the time that Robert Carlos Zamora was first placed in a patrol vehicle. Dkt. No. 256. The Government now addresses the Court's final two requests.

A. **THERE WAS PROBABLE CAUSE TO BELIEVE THAT A CRIMINAL OFFENSE EITHER HAD BEEN, OR WAS BEING COMMITTED, PRIOR[1] TO ANY STATEMENTS BY JOSE GERARDO AMARO, JR. DURING THE SEARCH OF THE GUN SAFE**

It is the Government's contention that there was probable cause[2] to believe that a criminal offense had been, or was being committed, by Jesus Guadalupe Covarrubias and Jose Gerardo Amaro, Jr., prior to any statements made by Amaro during the search of the safe.

Here, special agents with ATF were investigating the alleged theft of thirty assault-style rifles. During the investigation, they learned the location where the rifles were originally stored was on a ranch belonging to Covarrubias, a convicted felon prohibited from possessing firearms. Agents further discovered that the co-defendant, Amaro—the individual who made the initial complaint to the WCSO—listed an address on nineteen form 4473s that was different from the one he reported to WCSO in July.[3] Agents later confirmed via Amaro's parents that he was not living

---

[1] As outlined in this response, it's the Government's position there was probable cause of specific criminal activity prior to the statements made by Amaro during the search of the safe. However, at the time the defendants were detained on August 25, 2021, and based on the totality of the circumstances, the officers possessed a well-founded basis to conclude that Covarrubias, Amaro, and others were partaking in criminal activity. That basis alone is sufficient under the law, as the officers are not required to justify a belief that a particular crime has been or is about to be committed. *United States v. Pack*, 612 F.3d 341, 353–57 (5th Cir. 2010) (synthesizing authority and concluding that detention need not be justified by suspicion of a particular, specific crime). Rather, the circumstances in this case present themselves as such that the officers could reasonably suspect some legal wrongdoing. *Id*. *See also United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) ("Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.").

[2] "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that evidence bearing on that offense will be found in the place to be searched." *Pack*, 612 F.3d at 352.

[3] Regarding the 4473 forms, agents noted that the majority of purchases occurred after Amaro self-admitted to living at the Quail Hollow address for a year. Further, during the interview at the gas station, Amaro also stated he had purchased three more firearms after making the report

at the address listed on those forms (411 Peach Tree Lane, Unit B, Laredo, Texas), but was instead residing at the Quail Hollow residence. During the interview at the Exxon gas station, Amaro confirmed he had not been living with his parents at Peach Tree Lane, but instead had been residing with his aunt and uncle for the past year at the Quail Hollow address.

Special agents also noted Covarrubias' address to be the Sierra Gorda residence, the same address that his wife (Cynthia Moreno) listed on the fourteen 4473s she signed and dated.[4] Additionally, special agents reviewed the body camera footage from WCSO Deputy Sanchez, in which Amaro stated he was a "gun addict." A review of the footage also revealed that another co-defendant, Roberto Carlos Zamora, was on the ranch during the time in which the complaint was made. Zamora was identified by ATF and United States Border Patrol as a convicted felon and an undocumented alien, and thereby prohibited from possessing firearms or ammunition.

All this information was known to ATF before they initiated the surveillance operation on August 25, 2021. During the course of their surveillance, agents at the Sierra Gorda residence observed Amaro—who previously told special agents at the Exxon gas station he was going to court—arrive at the residence and go inside. Agents then noticed movement inside the garage and observed what appeared to be people bringing objects to vehicles parked nearby and placing them inside. At various points, agents observed Amaro, Zamora, Alejandro Rene Sanchez, and Covarrubias entering and exiting the residence. Agents subsequently observed these four individuals leave the property in different vehicles but appearing to travel together. Then, SA

---

with WCSO. Agents confirmed that Amaro listed the Peach Tree Lane address on those three 4473s as well.

[4] All the purchases made by Cynthia Moreno occurred after the defendant had been convicted of a felony offense, and thereby prohibiting him from possessing firearms or ammunition.

Insley, observed Covarrubias, Zamora, and Amaro arrive in their separate vehicles and meet up. Initially, Amaro went inside while Covarrubias and Zamora walked over to Amaro's pickup truck. The garage door then opened and Amaro walked over to the truck and pulled out a tan AR-type firearm and a black rifle bag.

Based on the collective knowledge of ATF and law enforcement involved in the investigation—and prior to any statements made by Amaro during the search of the gun safe—probable cause had been established that Covarrubias had committed the following offenses: (1) prohibited person in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2); and (2) the sale or transfer of a firearm to a prohibited person, in violation of Title 18, United States Code, Sections 922(d) and 924(a)(2).

Further, for Amaro, there was probable cause to believe that he had engaged in the acquisition of at least one firearm by making materially false statements at the time of purchase, in violation of Title 18, United States Code, Sections 922(a)(6) and 924(a)(2).

### B. LAW ENFORCEMENT DID NOT EXCEED THE SCOPE OF COVARRUBIAS' CONSENT TO SEARCH HIS RESIDENCE

Additionally, law enforcement did not exceed the scope of Jesus Guadalupe Covarrubias' consent to search his residence. Covarrubias asked several questions or requests concerning the consent to search of his house, but those questions or requests did not rise to the level of an agreed-upon condition. Moreover, Covarrubias signed a consent to search form that did not have any conditions listed on it.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness"—what a reasonable person would have understood by the exchange between the officer and the suspect. *United States v. Sarli*, 913 F.3d 491, 495 (5th Cir. 2019) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). And "[w]here there is ambiguity

regarding the scope of a consent, the defendant has the responsibility to affirmatively limit its scope. *Id.* (citing *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003).

Covarrubias ended his initial interview after asking for an attorney. Agents honored that request and ceased questioning. Covarrubias changed his mind and requested to speak to agents again. During this second conversation, Covarrubias gave consent to search his home. He told agents he wanted to work with them, and he needed to go home.

Covarrubias told SA Shaun Insley he would go with the agents to the search of the house. Gov. 1, Ex. 7 at 3. SA Insley explained he believed Covarrubias may be able to go with them, but Covarrubias would have to sit in the car. *Id.* Covarrubias then said, "I will agree if I step in with you." *Id.* SA Insley told Covarrubias no because of the liability it would put on the agents. Covarrubias agreed and asked if his wife could at least come to the car. Covarrubias asked to speak to his wife before agents spoke with her. SA Insley said they could not do that. Instead, they would go and speak to the wife first, and then Covarrubias could speak to her. *Id.*

Covarrubias next asked for a cigarette. *Id.* at 4-5. He asked if he could have one while leaving the building and then at his house. SA Insley said he could not guarantee it because he was not the case agent. Covarrubias then asked to speak with the case agent, SA Darren Johnson.

SA Johnson entered the interview room and spoke with Covarrubias. Covarrubias's main concern was not being arrested that night. However, he said he wanted to cooperate. *Id.* at 10. SA Johnson asked Covarrubias how he could cooperate, and Covarrubias admitted there were firearms in his house. *Id.* at 11. SA Johnson then asked Covarrubias if he would consent to a search of the house to get those firearms. Covarrubias said, "I'll go, I mean I would like to go with you." *Id.* at 15. Covarrubias asked if he could enter the house with them while being handcuffed. *Id.* He said

he would go in with the agents and give them the firearms. SA Johnson said, "I cannot promise you anything…" *Id.* at 16. Covarrubias then discussed the firearms and their locations.

Finally, SA Johnson asked Covarrubias whether he gave agents permission to search the house. Covarrubias said yes, as long as he was present. *Id.* at 19-20. SA Johnson clarified by asking Covarrubias if he was giving consent to search the house, and Covarrubias said, "as long as we are in agreement that you are going to help us, yes?" SA Johnson said he could not promise Covarrubias anything, but they would talk to his wife, give Covarrubias a chance to talk with his wife, and then talk with the Assistant United States Attorney. *Id.* at 21. Covarrubias was then given the consent to search form, and he signed it.

Covarrubias made several requests during his conversations with SA Insley and SA Johnson. However, those requests were not demands and cannot be turned into contractual conditions after the fact. The agents said several times during the conversations that they could not promise Covarrubias anything. Moreover, Covarrubias signed the consent to search form, and the consent to search form did not contain any conditions. There was ample space on the form for Covarrubias to write down any terms he wanted to. He chose not to do so.

Finally, even if this Court finds that the scope of the consent to search was violated, it would not result in the suppression of any evidence because agents received a separate consent to search the house from Covarrubias's wife. Covarrubias's wife's consent, standing alone, was legally sufficient for a search of the house.

**CERTIFICATE OF SERVICE**

  I certify that, on April 5, 2022, a true and correct copy of the Government's Supplementary Response to Motions to Suppress was electronically filed with the Clerk of the Court using the CM/ECF system, which will transmit notification of filing to all counsel of record.

            By: _____
               Brian Bajew
               Assistant United States Attorney