# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### LAREDO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIMINAL NO. 5:21-CR-1627-S-2** |
| | § | |
| **JOSE GERARDO AMARO, JR.** | § | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The United States of America, by and through Alamdar S. Hamdani, United States Attorney for the Southern District of Texas, and the undersigned Assistant United States Attorneys, herein responds to the Objections to Report and Recommendation of the United States Magistrate Judge on Defendant's Motion to Suppress.

## I. PROCEDURAL HISTORY

The Defendant was charged with violating various provisions of Title 18, United States Code, Sections 922 and 924. Dkt No. 86. On November 19, 2021, the Defendant filed a Motion to Suppress Evidence. Dkt. No. 162. The case was subsequently referred to United States Magistrate Judge Diana Song Quiroga for a hearing followed by a Report and Recommendation on the motions to suppress evidence and statements. Evidentiary hearings were thereafter held on February 22 and 24, with closing arguments on February 28, 2022.[1] On April 28, 2022, the Magistrate Court submitted its Report and Recommendation, finding that all three motions to suppress should be denied. Dkt. No. 267.

On February 10, 2023, the Defendant filed his Objections to Report and Recommendation of the United States Magistrate Judge on Defendant's Motion to Suppress. Dkt. No. 368. The

---

[1] Defendants Jesus Guadalupe Covarrubias (1) and Alejandro Rene Sanchez (4) each also filed a motion to suppress evidence. At the request of the parties, the Court consolidated hearings.

Government was subsequently ordered to respond to the pleading by February 27, 2023. Dkt. No. 369.

## II. TESTIMONY AND EVIDENCE PRESENTED AT THE HEARINGS[2]

### A. July 22, 2021 Theft Report and Review of 4473 Forms

Special Agent Darren Johnson with the Bureau of Alcohol Tobacco, Firearms and Explosives (ATF) testified that, on July 22, 2021, a Webb County Sheriff's Office (WCSO) Deputy was dispatched to a ranch in Webb County, Texas. The Deputy spoke to the Defendant, who stated approximately ten AK-style and twenty AR-style rifles were stolen from the ranch. Hr'g 1 at 11:03. The Defendant initially indicated the ranch belonged to his uncle, Covarrubias, although it was later learned they were brothers. Hr'g 1 at 11:05.[3] Further, in the theft report filed by the Defendant, he listed 1118 Quail Hollow Loop, Laredo, Texas as his residence. Hr'g 1 at

---

[2] The citations that follow in the subsequent sections are made to the specific hearing date. "Hr'g 1" represents testimony taken on February 22, 2022, while "Hr'g 2" represents the same, but for February 24, 2022. Additionally, when pieces of evidence are cited, it is in reference to the Government's Exhibit List filed for that defendant. "Gov. 1" references an exhibit from Covarrubias' exhibit list, "Gov. 2" references an exhibit from the Defendant's exhibit list, and "Gov. 4" references an exhibit from Sanchez's exhibit list. *See* Dkt. Nos. 240, 243, and 245. Lastly, any citations referencing a specific time during one of the hearings (e.g., "Hr'g 1 at 11:03") corresponds with the below testimony:

| | | |
|---|---|---|
| 1. | February 22, 2022: | |
| | a. Carlos Romero | 10:32 a.m. - 10:59 a.m. |
| | b. Darren Johnson | 11:01 a.m. - 12:32 p.m. |
| | | 01:22 p.m. - 03:35 p.m. |
| | | 03:58 p.m. - 04:18 p.m. |
| | c. Gerardo Morales | 04:19 p.m. - 04:51 p.m. |
| | | |
| 2. | February 24, 2022: | |
| | a. Shaun Insley | 10:08 a.m. - 11:15 a.m. |
| | | 04:08 p.m. - 05:11 p.m. |
| | b. Marco Rodriguez | 11:15 a.m. - 11:56 a.m. |
| | | 12:05 p.m. - 12:29 p.m. |
| | | 01:18 p.m. - 01:20 p.m. |
| | c. Francisco Estrada | 01:22 p.m. - 02:45 p.m. |
| | d. Darren Johnson | 03:09 p.m. - 03:32 p.m. |
| | e. Gerardo Morales | 03:33 p.m. - 04:07 p.m. |

[3] An appraisal title check was done on the property in question. Hr'g 1 at 2:25-6.

11:04. During some follow-up questioning, the Defendant told the Deputy one of the stolen rifles belonged to another brother, Jose Antonio Amaro, while another rifle belonged to a female subject he identified as Cynthia Moreno. Hr'g 1 at 11:05. Moreno was later identified as Covarrubias' wife. Hr'g 1 at 2:33.

Special Agent Johnson testified he received the theft report from WCSO and noticed it lacked information about the firearms, such as serial numbers. Special Agent Johnson also reviewed the Deputy's body-worn-camera and saw a fourth individual was present, Robert Carlos Zamora. Hr'g 1 at 11:07. Special Agent Johnson testified he was aware Zamora and Covarrubias were known to be prohibited from possessing firearms. Hr'g 1 at 11:07, 11:10; Gov. 1 Ex. 1. Additionally, Special Agent Johnson noted during his testimony that ATF previously served Covarrubias with a warning notice of a prohibited transaction on November 5, 2020. Hr'g 1 at 11:11.

Special Agent Johnson testified he obtained the firearms transaction records (Form 4473) for the Defendant, Covarrubias, and Moreno, and that he was going to interview them to obtain more information about the stolen firearms. Hr'g 1 at 11:12. Specifically, a review of the nineteen 4473s signed and dated by the Defendant revealed he listed an address on Peach Tree Lane, which was different from the Quail Hollow address he reported to WCSO in July. Hr'g 1 at 11:13-14; Gov. 2 Ex. 1. The 4473s also showed that most of the firearms purchases involved AR and AK-style semi-automatic rifles. Gov. 2, Ex. 1. Additionally, a review of Moreno's 4473s showed purchases starting in 2019, after her husband's 2014 felony conviction, and which listed an address on Sierra Gorda Drive associated with Covarrubias. Her purchases also included AR and AK-style rifles. Hr'g 1 at 11:16, 2:32.

**B. August 25, 2021 Encounter with the Defendant's Parents at Peach Tree Lane**

On August 25, 2021, at about 10:00 a.m., two groups of law enforcement personnel went to try and interview the Defendant, due to him reporting two different addresses. Hr'g 1 at 11:20. Special Agent Shaun Insley and Task Force Officer (TFO) Marco Rodriguez went to Peach Tree Lane, where they met with the Defendant's parents. Hr'g 1 at 11:32. During that time, it was learned the Defendant hadn't lived with them for the past year and that he was actually living with his aunt and uncle at the Quail Hollow residence. Hr'g 1 at 11:32. Special Agent Insley and TFO Rodriguez also learned their other son, Tony Amaro (Jose Antonio Amaro), was living with Covarrubias at the Sierra Gorda house. Hr'g 1 at 11:32.

### C. August 25, 2021 Encounter with the Defendant's Uncle at Quail Hollow Property

While agents were speaking with the Defendant's parents at the Peach Tree Lane residence, Special Agent Marissa Perez and TFO Gerardo Morales arrived at the Quail Hollow residence a little after 11:00 a.m. Hr'g 1 at 4:22. During that time, the agents met with the homeowner, who confirmed the Defendant was their nephew and lived with them for about a year. Hr'g 1 at 4:23. The agents also learned the Defendant was at work and driving a white Chevrolet Silverado truck. Hr'g 1 at 11:32.

### D. August 25, 2021 Encounter with the Defendant at Exxon Gas Station

Special Agent Perez and TFO Morales left the Quail Hollow residence and stopped to get gas at a nearby Exxon gas station. While at the gas station, they saw the Defendant and his truck. Hr'g 1 at 4:24. The agents introduced themselves to the Defendant and explained they were trying to follow up on the theft report he filed back in July. Hr'g 1 at 4:21-4:25. The Defendant, who would later acknowledge he felt free to leave during the encounter, agreed to speak with the agents. Hr'g 2 at 3:16.

During the encounter with the Defendant, TFO Morales noted that his identification listed

the Peach Tree address, to which the Defendant indicated he had a dispute with his parents eight to twelve months prior and moved in with his uncle on Quail Hollow. Hr'g 1 at 4:27. The Defendant stated to the agents the approximate number of firearms stolen the ranch, but was again unable to provide specifics as to the firearms. Hr'g 1 at 4:28. The Defendant further stated he purchased three firearms after the theft report was made, and still had one of the rifles that was purchased prior to the theft. Hr'g 1 at 4:28. The Defendant stated he kept those firearms in a gun safe inside the garage at Quail Hollow. Hr'g 1 at 4:29. The agents then asked if they could go with the Defendant to Quail Hollow to verify he still had the firearms, but the Defendant responded he had a court hearing at 9:00 a.m. and needed to go to work after. Hr'g 1 at 4:29.[4] The Defendant did tell the agents he would meet with them the next day around 9:00 a.m. at Quail Hollow. Hr'g 1 at 4:29. After the agents and the Defendant parted ways, Special Agent Johnson was informed about the meeting, which had been recorded. Hr'g 1 at 4:30; Gov. 2, Ex. 2.

### E. August 25, 2021 Surveillance of Sierra Gorda

On August 25, 2021, Special Agent Johnson arrived at the Sierra Gorda residence with the intention of interviewing Cynthia Moreno. Hr'g 1 at 11:19. However, Special Agent Johnson testified he became suspicious after he saw Zamora arrive at the house on a motorcycle, so he asked Special Agent Insley and TFO Rodriguez to help him set up surveillance. Hr'g 1 at 11:35-36. Special Agent Johnson thereafter testified he saw people and vehicles arrive and leave the house. Hr'g 1 at 11:37. Specifically, Special Agent Johnson noted that, at one point, Zamora left the house with someone in a blue Mercedes Benz SUV, and that Tony Amaro arrived in a red pickup truck. *Id*.

Along with the above observations, Special Agent Johnson saw the Defendant arrive in his

---

[4] The meeting between the agents and Amaro began at about 11:30 a.m. Hr'g 1 at 4:21-25.

truck, despite the fact he had just told law enforcement he was due in court. Hr'g 1 at 11:38. The Defendant reversed his truck in the driveway as people moved in and out of the front door of the house, and between the garage and the driveway. Hr'g 1 at 11:39. After the Defendant arrived, Special Agent Johnson testified he saw Zamora move the Mercedes and park it between the front door and the garage. Hr'g 1 at 11:42. Special Agent Johnson testified that, because the Mercedes obstructed some of his view to the Defendant's truck, all he could see was that Zamora had taken "something square" between a motorcycle and the Silverado. Hr'g 1 at 11:52-53, 1:35-38.

Special Agent Johnson testified that, a short time later, he observed Covarrubias, the Defendant, and an individual later identified as Alejandro Rene Sanchez exit the house. Hr'g 1 at 11:42-43. Sanchez was seen getting into the Mercedes and driving away briefly before returning to the front of the house and receiving what, according to Special Agent Johnson, appeared to be money from Covarrubias. Hr'g 1 at 11:43. Special Agent Johnson also testified he saw Zamora come out from the house and hand Covarrubias a radio. Hr'g 1 at 11:46. Eventually, Special Agent Johnson saw the Defendant depart in the Silverado, Sanchez in the Mercedes, and Covarrubias and Zamora on motorcycles. Hr'g 1 at 11:46. Special Agent Johnson testified he communicated with other agents and requested assistance from the Laredo Police Department to pull over the Mercedes that was following the Silverado. Hr'g 1 at 11:47. At about 1:15 p.m., the surveillance team left the Sierra Gorda residence and traveled to Quail Hollow. Hr'g 1 at 11:57.

While on the way to the Quail Hollow residence, TFO Rodriguez spotted the Mercedes following the Silverado and saw it was stopped by police at a Valero gas station. TFO Rodriguez also observed the Silverado pulled into the gas station before making a U-turn and heading towards Quail Hollow. Hr'g 2 at 11:21-22, 11:24.

**F. August 25, 2021 Detention of Sanchez at Valero Gas Station**

After the vehicles departed Sierra Gorda, LPD Officer Frank Estrada responded to the ATF's request for assistance and began following the Mercedes. Hr'g 2 at 1:22. Officer Estrada testified he observed the Mercedes parked on railroad tracks while stopped at a red light, and subsequently pulled the vehicle over at a nearby Valero gas station around 1:25 p.m. Hr'g 2 at 1:24, 1:46.[5]

After stopping the Mercedes, Officer Estrada approached and made contact with Sanchez, who was the driver.[6] Officer Estrada asked Sanchez for his driver's license and told Sanchez why he was being pulled over. Hr'g 2 at 1:48; interpreter/transcript at 1:54-56; Gov. 4 Ex. 14 at 5.[7] Sanchez admitted to knowing he was parked on the railroad tracks and, after giving his name, date of birth, and address, stated he was on "pretrial" and didn't have a driver's license. Sanchez then told Officer Estrada he worked for a company called JECOV, and that the vehicle belonged to his boss, Jesus Covarrubias. Hr'g 2 at 1:49, 1:56; Gov. 4 Ex. 14 at 6.

Officer Estrada testified he returned to his unit and relayed the information to Special Agent Johnson, who asked Officer Estrada to try to obtain consent to search the vehicle for contraband. Hr'g 2 at 2:04; Gov. 4 Ex. 14 at 7. Additionally, Special Agent Johnson informed Officer Estrada that Sanchez was an *Hermandad de Pistoleros Latinos* (HPL) gang member and possibly a felon. Gov. 4 Ex. 14 at 7. Officer Estrada then ran computer checks and could hear TFO Morales talk to TFO Rodriguez over the radio channel as they followed the Defendant to Quail

---

[5] During Officer Estrada's testimony, the dash camera footage for his vehicle was admitted into evidence and published, which showed the Mercedes parked on the tracks. *See* Gov. 4, Ex. 3 at 0:00 – 4:02. Also captured is the Defendant's white Chevrolet Silverado, directly in front of the Mercedes and pulling into the gas station.

[6] The interaction was recorded via Officer Estrada's body-worn-camera and admitted into evidence during the hearing. *See* Gov. 4, Ex. 4.

[7] "MV3" was identified in Government's Exhibit 14 as TFO Gerardo Morales, while "MV5" was identified as Special Agent Johnson.

Hollow. Gov. 4 Ex. 14 at 8. During that time, the officers could be overheard talking about how they suspected the Defendant had moved firearms from Sierra Gorda and that, "hopefully we'll catch him in the act while he's at the house." Hr'g 2 at 2:05-08; Gov. 4 Ex. 14 at 8.

Officer Estrada testified he learned Sanchez had five arrest warrants for unpaid traffic tickets. Hr'g 2 at 1:49-50; Gov. 4 Ex. 14 at 9.[8] Officer Estrada told Sanchez about the arrest warrants, to which Sanchez replied he had been to court recently for some robbery cases but did not know about the warrants. Gov. 4 Ex. 14 at 9. Officer Estrada also informed Sanchez that the vehicle's window tint was too dark and would cite him for that violation as well. Hr'g 2 at 1:51; Gov. 4 Ex. 14 at 13-14; Gov. Ex. 6. Officer Estrada then asked if he could search the vehicle, at which time Sanchez denied consent. Gov. 4 Ex. 14 at 14-15. Officer Estrada went back to his vehicle and told TFO Morales that Sanchez denied consent, and was informed that firearms were being unloaded in the garage at Quail Hollow. Gov. 4 Ex. 4 at 25:06-32. TFO Morales could then be heard asking Officer Estrada to either find probable cause or tow and inventory the vehicle because Sanchez was driving without a license. Gov. 4 Ex. 4 at 25:26-41. Officer Estrada confirmed with a supervisor he couldn't tow the vehicle on the grounds that Sanchez did not possess a driver's license. Gov. 4 Ex. 4 at 26:20-56; Gov. 4 Ex. 14 at 16.

After learning the above, Dispatch informed Officer Estrada that Sanchez, "[had] a negative history for possession of marijuana, possession of controlled substance. Also has 5 active capias." Gov. 4 Ex. 4 at 31:21-34; Gov. 4 Ex. 14 at 18. TFO Morales subsequently radioed Officer Estrada and told him an undocumented alien was inside the house at Quail Hollow and that, "if you don't see any way to get in [to the Mercedes] without PC, go ahead and just get ID and then let go." Gov. 4 Ex. 4 at 33:20-38; Gov. 4 Ex. 14 at 18; Hr'g 2 at 2:23. Officer Estrada stated he

---

[8] *See* Gov. 4, Ex. 5.

would let Sanchez go and join the officers at Quail Hollow. Gov. 4 Ex. 4 at 33:38-45; Gov. 4 Ex. 14 at 18. At 1:49 p.m., Officer Estrada went back to Sanchez, handed him the citations, and said he was free to go. Gov. 4 Ex. 4 at 33:50.

After stating Sanchez was free to leave, TFO Morales instructed Officer Estrada to detain Sanchez. Gov. 4 Ex. 14 at 19; Hr'g 2 at 2:23-24. Officer Estrada reapproached Sanchez and detained him at 1:50 p.m., telling Sanchez he "had already let [him] go" but some investigators were on their way to talk to him. Gov. 4 Ex. 14 at 19; Hr'g 2 at 2:25. Sanchez was thereafter handcuffed and placed in the front passenger seat of Officer Estrada's patrol unit. Gov. 4 Ex. 4 at 34:30-36:15. By 2:01 p.m., Officer Estrada learned the agents would be taking longer because there was a person "barricaded" at Quail Hollow. Gov. 4 Ex. 4 at 46:28; Gov. 4 Ex. 14 at 26. At 2:14 p.m., Officer Estrada spoke with TFO Morales, arrested Sanchez on the outstanding warrants, and impounded the Mercedes. During the course of Officer Estrada's testimony, it was elicited that, initially, the plan was to take Sanchez to Walker Plaza for questioning, then take him to a magistrate at the municipal courthouse before close of business. Gov. 4 Ex. 4 at 58:00-60:00; Gov. 4 Ex. 14 at 28. Officer Estrada thereafter instructed a second officer on-scene to take Sanchez to Walker Plaza and told Sanchez he was being arrested on the capiases and would first be taken to an investigator. Gov. 4 Ex. 4 at 1:00:10; Gov. 4. Ex. 14 at 29.

After Sanchez left in the patrol unit, Officer Estrada requested a tow truck for the Mercedes. Gov. 4 Ex. 4 at 1:01:23; Gov. 4. Ex. 14 at 29-30. During his testimony, Officer Estrada stated he was familiar with the LPD towing and inventory policy and testified he believed he couldn't leave the Mercedes unattended. Hr'g 2 at 2:16; Gov. 4 Ex. 7. Officer Estrada testified he conducted an inventory search of the Mercedes, which revealed a gun magazine inside a bag and a handgun on the back pocket of the front passenger seat. Gov. 4 Ex. 4 at 1:05:17, 1:06:25; Hr'g 2 at 2:16; *see*

*also* Gov. 4 Exs. 8 and 9. Officer Estrada also completed a vehicle impoundment form. *See* Gov. 4 Ex. 10.

### G.  August 25, 2021 Detention of Covarrubias, the Defendant, and Zamora

While Officer Estrada was conducting the traffic stop of Sanchez, at about 1:30 p.m., Special Agent Insley and TFO Rodriguez arrived at Quail Hollow. Hr'g 2 at 10:21. During this time, TFO Rodriguez testified he saw the Silverado at Quail Hollow before leaving and meeting up with Covarrubias and Zamora about a block and a half away. Hr'g 2 at 11:23. TFO Rodriguez testified he saw Covarrubias, Zamora, and the Defendant meet side-by-side and talk for a few minutes before ultimately driving over to the Quail Hollow house. Hr'g 2 11:25-26, 11:31; Gov. 2 Ex. 3.1.

Special Agent Insley testified he saw Covarrubias, Zamora, and the Defendant arrive and talk briefly. Hr'g 2 at 10:13. Special Agent Insley testified he then saw the Defendant enter the house, open the garage door, and come back out. Hr'g 2 at 10:13. The Defendant then spoke to Covarrubias and Zamora in the driveway before walking over to the Silverado, retrieving a tan rifle and a long rectangular bag from the truck, and walking back toward the house. Hr'g 2 at 10:13-14. Special Agent Insley testified that, in his experience, long, rectangular-shaped black bags like the one he observed are usually rifle bags. Hr'g 2 at 10:13-14. Further, Special Agent Insley testified that, once Covarrubias and Zamora saw the Defendant had the items, they walked in front of the Defendant and proceeded through the garage and into the house. Hr'g 2 at 10:14.

Special Agent Insley testified he had been instructed to detain the Defendant if he saw any firearms removed from the truck. Hr'g 2 at 11:03, 11:08. Based on what he had just seen, Special Agent Insley parked his unmarked vehicle in front of Quail Hollow, stood in the driveway, identified himself to the Defendant as law enforcement, and asked "whose firearms are those?"

Hr'g 2 at 10:16.[9] Special Agent Insley testified the Defendant was standing in front of a large gun safe with a tan rifle, a black rifle, and a black bag. Hr'g 2 at 10:16. Further, Special Agent Insley testified the Defendant did not respond and continued to load the rifles into the safe until he finished and locked it. Hr'g 2 at 10:16. At that point, Special Agent Insley testified he again asked who owned the rifles, to which the Defendant stated they were his. Hr'g 2 at 10:17. Special Agent Insley testified he then asked the Defendant where he got the rifles from, and the Defendant replied by asking if Special Agent Insley had a warrant. Hr'g 2 at 10:17. Special Agent Insley testified he told the Defendant he didn't have a warrant, and that the Defendant came closer but ignored his questions. Special Agent Insley testified the Defendant then "stepped away and turned his shoulder," as if to "pedal back" into the house. Hr'g 2 at 10:18, 11:33-37.

Special Agent Insley testified that, to prevent the Defendant from fleeing into the house, he placed a hand on the Defendant's shoulder and told him he would be detained for questioning. Hr'g 2 at 10:18, 10:33.[10] Special Agent Insley testified the Defendant displayed a tactic known to him as "passive resistance," wherein the Defendant let his body go limp and drop to the ground. Hr'g 2 at 10:18. At this point, Special Agent Insley and TFO Rodriguez, who was now on-scene, grabbed the Defendant by the arms and placed him in handcuffs. Hr'g 2 at 10:34. Special Agent Insley testified that the Defendant cried out for his aunt, at which time Corina Valdez and Covarrubias came out of the house. TFO Rodriguez then informed Ms. Valdez and Covarrubias of the on-going firearm investigation. Hr'g 2 at 11:40. At 1:42 p.m., backup arrived and the Defendant was moved into a patrol unit. Hr'g 2 at 10:35-36, 12:20, 12:23; *see also* Dkt. No. 254. TFO

---

[9] Testimony was elicited from TFO Morales (Hr'g 1 at 4:24) and Special Agent Insley (Hr'g 2 at 10:15-16) that the agents and TFOs were in plain clothes, drove unmarked vehicles, and did not draw their weapons.

[10] Defendant's summation of these events misstates the testimony of Special Agent Insley. *See* Def. Obj. at 4 ("Insley and TFO Rodriguez then entered the garage and forcefully grabbed, detained, placed Amaro on the floor, and handcuffed him while in the garage."). *See* Hr'g 2 at 10:17:35–10:19:40, 10:32:00-10:34:10.

Rodriguez also testified that Covarrubias was detained and stood without handcuffs in the driveway. Hr'g 2 at 11:41, 11:43.

Special Agent Insley testified he was scared of the "unknown" situation posed by Zamora remaining inside the house with possible access to firearms. Hr'g 2 at 10:44, 11:12. More law enforcement then arrived—for a total two marked units and four unmarked units on-scene—upon hearing about the struggle with the Defendant.[11] Special Agent Johnson, once on-scene, learned that Zamora was still inside the house[12] and was told by Ms. Valdez there were firearms inside. Ms. Valdez also consented to a search of the house. Hr'g 1 at 11:57, 11:59; Hr'g 2 at 2:40.

According to the testimony, officers surrounded the house and called out for Zamora to exit. Hr'g 1 at 2:10. During this time, Covarrubias offered to call Zamora on his cellphone. Covarrubias, then still in possession of his phone,[13] called Zamora, at which time Zamora came out from the house. Hr'g 1 at 11:47-50. Zamora was handcuffed and placed in a patrol unit at 2:06 p.m. *See* Dkt. No. 256 at 4. Afterwards, agents conducted a protective sweep of the house. Hr'g 1 at 12:02-03.

While law enforcement was on-scene, the Defendant's parents arrived and asked to speak to their son. TFO Rodriguez saw the parents and told Special Agent Johnson, who met with them a block north of the residence around 2:08 p.m. Hr'g 1 at 12:03, 1:47. Special Agent Johnson testified he introduced himself, explained what was going on, and suggested it would be best for the parents to meet their son at the ATF Field Office at Walker Plaza. Hr'g 1 at 12:03, 12:09. Special Agent Johnson testified he then returned to the scene, determined it was secure, and

---

[11] Hr'g 1 at 2:55.

[12] Hr'g 1 at 11:57, 11:59; Hr'g 2 at 2:40, 2:55.

[13] *See* Hr'g 2 at 11:47 (testimony of TFO Rodriguez).

brought the Defendant's parents over. Hr'g 1 at 12:04. Special Agent Johnson located the Defendant in one of the patrol units and at 2:33 p.m., the Defendant was let out while still handcuffed. Hr'g 1 at 1:59, 2:06.

Special Agent Johnson testified he told the Defendant his parents wanted to talk to him. Hr'g 1 at 1:59, 2:06. The Defendant remained silent while his mother told him to tell the truth and asked what happened. Hr'g 1 at 2:05; Gov. 2 Ex. 8 at 2:35-3:05.[14] After the conversation with his parents, Special Agent Johnson asked for the Defendant's consent to search his bedroom and the gun safe and emphasized that the Defendant was not being forced to do so. Hr'g 1 at 2:05; Gov. 2 Ex. 8 at 3:35-5:50. The Defendant thereafter provided Special Agent Johnson with verbal consent to search his bedroom and gun safe. Hr'g 1 at 12:11, 12:03; Hr'g 2 at 2:12; Gov. 2 Ex. 8 at 5:06; *see also* Gov. 2 Ex. 4. Further, Special Agent Johnson reviewed and read aloud an ATF Consent to Search Form (Gov. 2 Ex. 5) and confirmed twice that the Defendant understood the rights he would be waiving. Gov. 2 Exs. 5, 8 at 5:26-50; Hr'g 1 at 12:05, 12:14.[15]

Special Agent Johnson also read the Defendant his *Miranda* rights using the ATF Advice of Rights and Waiver form. Hr'g 1 at 12:11-2, 12:14; Gov. 2 Ex. 8 at 7:23-8:40; *see also* Gov. 2 Ex. 6. After reading the form to the Defendant, Special Agent Johnson told the Defendant he had an obligation to inform the Defendant of his rights and that he was being detained. Special Agent Johnson asked if the Defendant understood his rights and if he was willing to speak to law enforcement, and the Defendant agreed to both. *Id*. As the Defendant began to initial next to each

---

[14] Defendant's summation of the conversation is also a misstatement of the testimony. *See* Def. Obj. at 4. Along with the above, which represents the actual testimony taken from Special Agent Johnson, the Government also admitted into evidence the recording that captures the conversation in question. See Gov. 2 Ex. 8 at :00-3:00.The Defendant's parents can be heard stating "la verdad" ("the truth") and "que paso" ("what happened?"). The defendant remained quiet and did not reply to his parents' questions.

[15] Defendant states "Amaro involuntarily and unknowingly signed the consent to search, advisement of rights waiver, and provided agents with the combination to the gun safe." Def. Obj. at 5. This is a legal conclusion and not part of the actual testimony of the witnesses or evidence submitted.

line on form, Special Agent Johnson stated, "and I just want to make sure you understand, you understand these rights, correct?" Gov. 2 Ex. 8 at 8:29-8:34. The Defendant reiterated that he understood, initialed next to each line on the form, and then signed and printed his name. Hr'g 1 at 12:11-12, 12:14; Gov. 2 Ex. 8 at 8:21-44. The Defendant then asked if he was under arrest, at which point Special Johnson told him there was an ongoing investigation and they (law enforcement) were still collecting facts. Gov. 2 Ex. 8 at 8:51-9:10. Special Agent Johnson told the Defendant that, because the government was detaining him, the Defendant had a right to be told he could remain silent, that he could ask for an attorney, and that for "self-incrimination purposes, the 4th and 5th Amendment right, that's why I'm advising you and I want to make sure you understand those rights." Gov. 2 Ex. 8 at 8:51-9:10. The Defendant again stated he understood his rights and was willing to speak to Special Agent Johnson. Gov. 2 Ex. 8 at 9:08-11. Around this time, Covarrubias gave permission to search the Silverado and was later handcuffed and placed in a unit at 2:41 p.m. Hr'g 1 at 2:43; Hr'g 2 at 3:29-30; *see also* Dkt. No. 254 at 3.

Special Agent Johnson testified that, as he and the Defendant began to search the safe and bedroom at 2:44 p.m., the Defendant made inculpatory statements about himself and others. The Defendant stated they moved the firearms from Sierra Gorda to Quail Hollow in anticipation of the agents checking them, that the firearms had not been in his possession because Covarrubias "told them to take care of them for now," and that the fingerprints of Sanchez, Zamora and Covarrubias would be found on the rifles and the case from the process of loading up the Silverado. Hr'g 1 at 12:25-30; Gov. 1 Exs. 2, 3; Def. 2 Exs. 2, 3; Gov. 2 Ex. 8 at 11:00-18:40. The interview of the Defendant at Quail Hollow concluded at 2:51 p.m. Gov. 2 Ex. 8 at 18:50. The Defendant was then placed back into a patrol unit, at which time the Defendant, Covarrubias, and Zamora were transported to Walker Plaza for further questioning around 3:00 p.m. Hr'g 2 at 3:23.

### H.  Interview of the Defendant at Walker Plaza

Special Agent Johnson testified that, by 3:30 p.m., Covarrubias, the Defendant, and Zamora were at the ATF Laredo Field Office at Walker Plaza. Hr'g 2 at 3:13. The Defendant's interview began at 3:31 p.m. Gov. 2 Ex. 7. Prior to any substantive questioning, Special Agent Johnson reminded the Defendant that he had been advised of his *Miranda* rights earlier and had granted consent to search and confirmed that the Defendant was still willing to talk with the agents. Hr'g 2 at 3:14-15; Gov. 2 Ex. 7. Special Agent Johnson also testified he had offered water to the Defendant prior to any questioning because it had been hot outside and the Defendant stated he felt dizzy earlier. Hr'g 2 at 3:18; *see also* Gov. 2 Ex. 7 at 1:16-33. Special Agent Johnson testified that, during his interview, the Defendant made incriminating statements about himself and others, and also gave consent to search two mobile cellphone devices. Hr'g 2 at 3:16, 3:20.

### I.  Interview of Sanchez at Walker Plaza

Prior to being interviewed, Sanchez requested medical assistance. Hr'g 1 at 10:33-37. Laredo Fire Department EMT Carlos De Leon Romero thereafter responded and treated Sanchez at 5:21 p.m. Paramedic Romero testified that Sanchez complained of feeling unwell due to receiving the COVID vaccine a day earlier. Hr'g 1 at 10:33-37. Paramedic Romero testified that Sanchez's vitals were within normal range, and after a general well-being assessment, Sanchez refused further treatment. Hr'g 1 at 10:33-37. During his testimony, Paramedic Romero recalled Sanchez was feeling fatigued but had no fever or vomiting and was medically cleared after five to ten minutes. Hr'g 1 at 10:54-55. At about 7:30 p.m., TFOs Morales and Rodriguez went to interview Sanchez. Hr'g 2 at 3:38. TFO Morales testified the interview was slightly delayed because he was assisting in gathering ammunition and firearms from the scene at Quail Hollow and then had to process the evidence at Walker Plaza. Additionally, he testified that, because they

were short-handed, TFO Morales interviewed Zamora before approaching Sanchez. Hr'g 2 at 3:36-37.

Once TFOs Morales and Rodriguez were in the interview room, Sanchez was uncuffed. Gov. 4 Ex. 11. TFO Morales testified he introduced himself, asked a series of biographical questions, and explained the nature of the investigation. Hr'g 2 at 3:38; Gov. 4 Ex. 11 at 4:06-5:00. Sanchez reported he had been arrested before and was familiar with the process of *Miranda*. Hr'g 2 at 3:41. TFO Morales then read to Sanchez his rights using a waiver form and asked Sanchez if he understood his rights. Gov. 4 Ex. 11 at 5:45-7:23. Sanchez stated he understood and everyone signed the form. Hr'g 2 at 3:40; *see also* Gov. 4 Ex. 12. During his testimony, TFO Rodriguez denied yelling, using force, touching or being aggressive with Sanchez and characterized the conversation as normal and casual. Hr'g 2 at 3:41-42. During the interview, Sanchez made incriminating statements about himself and others. Further, at no point did Sanchez request medical assistance, and TFO Rodriguez testified there was no indication Sanchez was sick, otherwise he would have followed up. Hr'g 2 at 3:46-47.

## J. First Interview of Covarrubias at Walker Plaza

Prior to being interviewed, Covarrubias complained of feeling unwell. Paramedic Romero testified that, since he was already on-scene, he checked Covarrubias after clearing Sanchez. Hr'g 1 at 10:37-44. Paramedic Romero testified he took Covarrubias' vital signs and determined they were within normal limits. Hr'g 1 at 10:37-44. Paramedic Romero testified Covarrubias' blood sugar levels were normal according to the glucometer and recalled an officer offering the defendant something to eat or drink. Hr'g 1 at 10:38. Paramedic Romero testified he asked Covarrubias some short and long-term memory questions and determined Covarrubias was "alert and oriented." Hr'g

1 at 10:40-41. Paramedic Romero testified Covarrubias refused further treatment and transportation to a hospital. Hr'g 1 at 10:40-41.

After learning he was medically cleared, Special Agents Insley and Christopher Joliet approached Covarrubias at 5:44 p.m. to interview him.[16] At the beginning of the interview, Covarrubias stated he didn't want to be rude but wasn't sure if he should call his lawyer. Gov. 1 Ex. 5 at 1:18-39. Special Insley proceeded to tell Covarrubias, "[T]hose are your rights, and in fact I…I'm going to read you your rights." Gov. 1 Ex. 5 at 1:40. Covarrubias asked if he was being "formally arrested" and if there was a "charge," to which Special Agent Insley stated he didn't know. Gov. 1 Ex. 5 at 1:48-2:08. Then, Covarrubias stated, "If you guys bring a charge or whatever … should I call our lawyer…I dunno about what…but I mean whatever it is[.]" Gov. 1 Ex. 5 at 2:08-2:23. Special Insley responded by stating, "Sure, sure. Okay[.] Gov. 1 Ex. 5 at 2:24-2:30.

After this initial exchange, Special Agent Insley began to ask Covarrubias routine booking questions. Gov. 1 Ex. 5 at 2:30-35. During this time, Covarrubias and Special Agent Insley talked about the issues with Covarrubias' phone number and cell phone itself. Gov. 1 Ex. 5 at 3:36-5:07. Special Agent Insley asked Covarrubias the name of his wife and if he had any children, to which Covarrubias brought up how one of his children tested positive for COVID-19 the day before. Gov. 1 Ex. 5 at 5:29. Special Agent Insley then asked Covarrubias if he was born in the United States, what his social security number was, and if he had any cars. Gov. 1 Ex. 5 at 6:18-6:30. Everyone in the room could then be heard joking about owning cars and talking about how many vehicles the defendant possessed. During this time, Covarrubias mentioned he owned a house in Mexico, which was where he was keeping some of the vehicles. Special Insley and Covarrubias thereafter talked about owning a home in Mexico. Gov. 1 Ex. 5 at 6:30–8:48. Special Agent Insley

---

[16] *See* Gov. 1 Ex. 5.

asked Covarrubias where he worked, to which Covarrubias brought up working with JECOV Freight. Gov. 1 Ex. 5 at 8:50. Covarrubias remarked the handcuffs were making him uncomfortable, and they were removed. Gov. 1 Ex. 5 at 9:10. Covarrubias could then be heard asking "what's going on," to which Special Agent Insley proceeded to state, "this is a process and we're going through it." Gov. 1 Ex. 5 at 9:46.

Special Agent Insley told Covarrubias he was going to read aloud his *Miranda* rights. Covarrubias asked if being read his rights meant that he was being arrested, to which he was told that it did not. Special Agent Insley then read to Covarrubias from the waiver form, Covarrubias confirmed he understood his rights, and was asked to initial next to each right to show that he understood each right. Gov. 1 Ex. 5 at 15:00-17:08; Gov. 1 Ex. 4. Special Agent Insley then read the waiver portion of the advice of rights form and asked Covarrubias if he understood and was willing to answer questions without a lawyer present. Gov. 1 Ex. 5 at 17:05-17:25. Covarrubias replied, "can I answer the question with a question," to which Special Agent Insley stated, "Of course, I want you to understand your rights." Hr'g 1 at 17:14. Covarrubias asked what the questioning would be about, and Special Agent Insley indicated he would be asked about the events that occurred that day (August 25, 2021). Special Agent Joliet then told Covarrubias they wouldn't speak with him without "respecting your rights…till we get through the waiver process." Gov 1. Ex. 5 at 18:13. Covarrubias responded by saying, "I have nothing to hide and, honestly, I have not been treated in a bad way with you [ ]…we could cooperate but…if I choose to go with a lawyer, what would the next process be?" Gov 1. Ex. 5 at 18:20-19:10. Special Agent Insley explained that he was not the case agent, didn't have all the facts, and that Covarrubias "could be potentially let go right now if you lawyer up, or…if the case agent has more facts, you could be arrested." Gov 1. Ex. 5 at 19:10-21. Covarrubias asked, "so if I don't lawyer up I could still be arrested?"

Gov 1. Ex. 5 at 19:30. Special Agent Insley replied that "it's a possibility, but if you do cooperate and answer all the questions truthfully and honestly, that goes a long way, because we report everything we find today to the AUSA." Gov 1. Ex. 5 at 19:30-51. Covarrubias stated, "that he had nothing to hide or nothing illegal" and began talking about the motorcycle he was driving earlier that day. Gov 1. Ex. 5 at 19:50.

While talking about his vehicles again, Special Agent Joliet asked Covarrubias if he included his motorcycles as part of the "18 or 19 vehicles" that he mentioned earlier. Gov 1. Ex. 5 at 20:19. Covarrubias said, "I believe so, I dunno," to which he then apologized and stated his brain was "fried" from taking medication "and everything going on," then said, "but you know what, ask away." Gov 1. Ex. 5 at 20:20. Special Agent Insley then told Covarrubias that "if you agree to answer these questions, I need you to sign and print your name here." Gov 1. Ex. 5 at 20:50-21:00. Covarrubias signed the waiver form.

During the course of the interview, Covarrubias made inculpatory statements. Then, near the end, Special Agent Insley asked Covarrubias for consent to search Sierra Gorda for any more firearms, read aloud a consent form, and explained the process. Covarrubias asked, "are we getting arrested?" Gov. 1 Ex. 5 at 1:23:33. The agents said the AUSA was still reviewing the facts, and that they have bosses just like in Covarrubias' logistics company. Covarrubias could then be heard on the recording attempting to extract assurances from the agents. Special Agent Insley reminded Covarrubias he could not make charging decisions, at which point Covarrubias stated, "I've been going and going and going with you…you can't make decisions you have bosses…you know what, I want a lawyer." Gov 1. Ex. 5 at 1:24:13-25:25. Special Agent Insley immediately terminated the interview and could be heard stating the interview was over at 8:04 p.m. Gov 1. Ex. 5 at 1:25:28.

### K. Second Interview of Covarrubias at Walker Plaza

At 10:05 p.m., Covarrubias asked to speak with agents again and Special Agent Insley responded. At first, Covarrubias and Special Agent Insley talked about if he would consent to a search of his residence. Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 2-3. Covarrubias then made several requests, such as no repercussions for his wife and brothers. Covarrubias also said he would agree to the search of the residence "if I step in with you," to which Special Agent Insley replied, "[n]o…that puts a lot of liability on us[.]" Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 3. Covarrubias confirmed that his consent would "still not guarantee[] that I'm not gonna get arrested." Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 5. Special Agent Insley reiterated, "[a]gain, it's up to the AUSA." Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 5. Covarrubias then requested to speak with the case agent, at which time Special Agent Johnson arrived. Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 6. Special Agent Johnson reminded Covarrubias of his *Miranda* rights and prior waiver. Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 6-8. Covarrubias stated, "alright, is there a way to avoid any of us going to jail tonight?" Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 8. Special Agent Johnson remarked, "I can't promise you you're not gonna go to jail tonight…I can't promise you anything." Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 8. Covarrubias then stated he kept three or four firearms in his bedroom, all purchased under his wife's name. Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 12, 13-14. Special Agent Johnson asked, "will you give me permission to get those arms that are in your bedroom?" Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 16. Covarrubias replied that, "I would like to go with you" inside the house so as to not alarm his family, to which Special Agent Johnson stated he couldn't promise anything. Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 16-17. Covarrubias then admitted that a rifle bought by Tony Amaro was also in his bedroom. Gov. 1 Ex. 6; Gov. 1 Ex. 7 at 18. Covarrubias subsequently signed the consent form to have his home at Sierra Gorda searched. Gov. 1 Ex. 9.

## III. GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS

The Defendant objects to the Report and Recommendation on multiple grounds. First, the Defendant makes several factual objections. Second, the Defendant makes various legal objections to the Magistrate Court's findings and conclusions. The Government disagrees with the Defendant and asks this Court to adopt the Report and Recommendation of the Magistrate Court.

### A. Factual Objections

#### i. Arrival at Sierra Gorda

Defendant objects to the Court's finding that, "Johnson spotted Amaro arriving in the Silverado, despite him supposedly having to be in court." Def. Obj. at 5; R. & R. at 5. The testimony from TFO Morales was the Defendant told him and Special Agent Perez he was due in Court at 9:00 a.m., despite it being past 11:00 a.m. Further, Special Agent Johnson testified he observed the Defendant arrived at Sierra Gorda in the Silverado. Thus, the Magistrate Court's recitation of this fact is correct; the Defendant told law enforcement he was apparently supposed to be at one location (court) but was seen at another (Sierra Gorda).

#### ii. Special Agent Johnson's Observations at Sierra Gorda

Defendant objects to the Court's finding that "Johnson could not see which vehicle the object was placed in." Def. Obj. at 6; R. & R. at 6. The testimony was that Special Agent Johnson saw people moving between the garage and Silverado and observed that Zamora had taken "something square." The testimony was also that Special Agent Johnson couldn't see which vehicle the object was placed in. Hr'g 1 at 11:52-53, 1:35-38. This observation is one of many made on August 25, 2021, along with all the information known to law enforcement prior to surveilling Sierra Gorda and Quail Hollow.

#### iii. Stop of the Mercedes

Defendant objects to the Court's finding the Silverado followed the Mercedes into the Valero gas station after it was stopped. Def. Obj. at 6; R. & R. at 6. The evidence reflects the traffic stop of the Mercedes began on the train tracks and that, after Officer Estrada turned on his emergency lights, the Silverado and Mercedes both turned into the gas station. Thus, the Silverado did follow where the Mercedes was going, which was into the gas station and off the road. See Gov. 4 Ex. 3.

### iv. Detention of the Defendant at Quail Hollow

Defendant objects to the Court's findings of how the Defendant was detained. Def. Obj. at 6-7; R. &. R. at 6-8. The events that led to the detention of the Defendant are outlined in Section II(G) of the Government's response, which correctly recounts the testimony of Special Agent Insley. Ultimately, it is the Government's position, as well as the Magistrate Court's, that the Defendant was lawfully detained pursuant to an investigatory detention. That detention did not turn into an arrest until after inculpatory statements were made by the Defendant and probable cause found.

### v. Escalation of Events at Quail Hollow

Defendant objects to the Court's characterization that the situation "escalated at Quail Hollow." Def. Obj. at 7; R. & R. at 8. The events that led to the detention of the Defendant and others are outlined in Section II of the Government's response. The Government would also specifically highlight the testimony of Special Agent Insley, who noted he was afraid of the "unknown" situation posed by Zamora in the house with possible access to firearms. R. & R. at 8. Even before then, law enforcement suspected firearms were moved from Sierra Gorda to Quail Hollow, even before the situation with Zamora occurred. R. & R. at 27 ("Although agents did not

see any firearms at Sierra Gorda, they suspected that Amaro had transported the firearms from Sierra Gorda to Quail Hollow.").

Along with the above, the Government agrees with and incorporates into its response to this objection the below findings by the Magistrate Court:

> At the start of the encounter at Quail Hollow, Insley and Rodriguez were almost immediately confronted with an uncooperative suspect in a volatile situation involving firearms. When Insley asked Amaro about the firearms while in the driveway, Amaro became unresponsive and attempted to go into the residence where two suspects remained inside. *See United States v. Verner*, 275 F.3d 46 (5th Cir. 2001) (unpublished) (reasonable for officer to search and handcuff a suspect who was unresponsive and attempted to walk away from officer when asked if there were any weapons in vehicle). Insley suspected that Covarrubias, a felon, was directing the movement of large numbers of guns, possibly using this house as storage space for those weapons. *See United States v. Abdo*, 733 F.3d 562, 565-66 (5th Cir. 2013) (noting that police reasonably believed that defendant was armed and dangerous in part because defendant had purchase multiple items related to firearms and a large amount of gunpowder and had a large backpack on). Although Insley observed that Amaro had placed rifles into a safe, this did not eliminate the risk that Amaro or others inside might be armed. *See Michelletti*, 13 F.3d at 840-41 (noting that during investigatory stops a police officer need not be certain a suspect is armed, but rather whether a reasonably prudent person could believe based on specific and articulable facts that his safety or that of others is in danger.) When officers are faced with situations where suspects may be "armed and dangerous," they are permitted to take "swift measures to discover the true facts and neutralize the threat of harm." *Id.* at 843.

R. & R. at 29-30. Based on the above, the situation did, in fact, escalate, given the nature of the investigation, the suspects involved, and the potential dangers.

### vi. Consent to Search

Defendant objects to the Court's finding that Special Agent Johnson informed the Defendant his parents wanted to talk to him. Def. Obj. at 7; R. &R. at 9. What the testimony and

evidence show is that Special Agent Johnson was informed by TFO Rodriguez the Defendant's mother wanted to speak with her son. Special Agent Johnson then met with the Defendant's parents at their parked vehicle, which was approximately a block away from the Quail Hollow residence. Special Agent Johnson introduced himself, explained what was going on, and suggested it would be best for the parents to meet their son at the ATF Field Office at Walker Plaza. When asked if she thought the Defendant would give agents permission to check the safe, Ms. Amaro stated she didn't know about the safe and indicated she could ask and see if the Defendant wanted to talk. Special Agent Johnson then went back to the scene, observed it was safe for Mr. and Ms. Amaro to approach the area, and then asked Ms. Amaro she wanted to speak with the Defendant. The Defendant's parents thereafter approached him and asked "la verdad" ("the truth") and "que paso" ("what happened?"). During this time, and as reflect in Gov. 2 Ex. 8, the Defendant remained silent and there was no instruction by his parents to cooperate.

Additionally, the Government agrees with and incorporates into its response the findings by the Magistrate Court, which concluded, "[T]here was no evidence of coercive procedures. Amaro argued that officers coerced him vis-à-vis allowing his parents to speak with him on-scene. (Hr'g 1 at 1:43.) This Court is unconvinced. Amaro is an adult. The conversation between Amaro and his parents lasted fewer than five minutes, and his parents simply encouraged him to tell the truth." R. & R. at 41.

Along with the above, the Magistrate Court cited *Commonwealth v. Weaver*, 474 Mass. 787 (2016), which held a minor defendant's confession was voluntary even where defendant confessed after his mother invited detectives into her home, encouraged her son to sign the *Miranda* waiver, questioned her son extensively at the request of the officers, told her son that he

needed to tell the truth and needed to confess in order to save his soul, drove her son to the police station, and prayed over her son on the way to the station.

Ultimately, in applying *Weaver* and other cases[17] to the instant set of facts, what did not happen was the use of coercive tactics that would otherwise vitiate the Defendant's consent. Further, Defendant continues to provide no case law that, as the Magistrate Court noted in its Report and Recommendation, would demonstrate a brief discussion with parents renders either consent or a confession involuntary. R. & R. at 41.

vii. <u>Barricade Situation at Quail Hollow</u>

Defendant objects to the Court's finding that Estrada learned there was a barricade situation at Quail Hollow. Def. Obj. at 7; R. & R. at 12. The testimony was that Officer Estrada learned the agents would be taking longer because there was a person "barricaded" at Quail Hollow. *See* Section II(F) (citing to Gov. 4 Ex. 4 at 46:28; Gov. 4 Ex. 14 at 26). The Government would also refer to Section III(A)(v) of its response, which outlines the situation at Quail Hollow as it unfolded that day.

Additionally, the Government agrees with and incorporates into its response the findings by the Magistrate Court as to this issue. When the agents tried to ask about the firearms, the Defendant ignored their questions and attempted to go inside, where Covarrubias and Zamora— individuals known to be prohibited from possessing firearms—were as well. Special Agent Insley indicated he suspected Covarrubias was directing the movement of firearms and using his house as storage for them. Further, and as the Magistrate Court highlighted in its Report and Recommendation, simply because the rifles were placed into the safe, the risk that people were armed inside the house did not dissipate. R. & R. at 30 (citing *United States v. Michelletti*, 13 F.3d

---

[17] *See* R. & R. at 41, which cites to *United States v. Ballad*, 586, F.2d 1060, 1063 (5th Cir. 1978) (holding that encouraging a suspect to tell the truth is not inherently coercive).

838, 840-41 (5th Cir. 1994) (noting that during investigatory stops a police officer need not be certain a suspect is armed, but rather whether a reasonably prudent person could believe based on specific and articulable facts that his safety or that of others is in danger.)). Law enforcement was aware that a convicted felon was still inside the house and with access to firearms. As the *Michelletti* court noted, when officers are faced with situations where suspects may be armed and dangerous, they are permitted to take "swift measures to discover the true facts and neutralize the threat of harm." *Id.* at 843.

viii. <u>Defendant's Interview at Walker Plaza</u>

Defendant objects to the Court's alleged failure to include that the Defendant told Special Agent Johnson he was feeling sick. Def. Obj. at 7-8. The Court included this fact in footnote 22 of the report and recommendation. R. & R. at 14.

**B. Legal Objections**

i. <u>Warrantless Seizures – Objection to Case Law</u>

The Defendant objects to the Magistrate Court's "recitation of warrantless seizures jurisprudence in support of her recommendations and conclusions." Def. Obj. at 8; R. & R. at 19-25. The Defendant presents no case law to counter the Court's findings, which is merely a summation of the three tiers of police contact (consensual encounters, investigatory detentions, and arrests).

ii. <u>Investigative Detention of Defendant</u>

*a. Overall Findings*

The Defendant first objects to the Magistrate Court's overall finding the Defendant was seized upon the first point of physical contact with an ATF agent. Def. Obj. at 8-9. Defendant then

objects to the Court's legal findings, arguing he was unlawfully seized and arrested without a warrant in his home. *Id*.

The Government agrees with and incorporates into its response the overall findings of the Magistrate Court as to this issue. R. & R. at 25-34. The Court correctly concluded, based on an application of the law to the facts and evidence, that (1) the Defendant was seized upon the first point of physical contact with Special Agent Insley while (2) Covarrubias was seized when he was told he was being detained, (3) the seizures were investigative detentions justified by reasonable suspicion, and (4) the intrusiveness of the detentions were reasonable under the circumstances. *Id*.

### b. *Reasonable Suspicion for Investigative Detention*

The Defendant objects to the Magistrate Court's finding that law enforcement had reasonable suspicion to detain the Defendant. Def. Obj. at 9. Defendant argues he was unlawfully arrested without a warrant within the confines of his garage. *Id*. Defendant puts forth no new evidence or case law to support his position that would otherwise invalidate the findings of the Magistrate Court.

Here, special agents with ATF were conducting an investigation into the alleged theft of thirty assault-style rifles. During the investigation, they learned that the location of where the rifles were originally stored was on a ranch belonging to Jesus Covarrubias, a convicted felon. Agents further discovered that the defendant—who made the complaint to the WCSO—listed an address on nineteen form 4473s that was different from the one he reported to WCSO in July. Agents later confirmed via his parents the Defendant was not living at the address he listed on those forms (Peach Tree Lane) but was instead residing at the Quail Hollow residence. Special agents also noted Jesus Covarrubias' address to be the Sierra Gorda residence, and the same address that his wife (Cynthia Moreno) listed on the fourteen 4473s she signed and dated. Special Agents further

noted that the firearms being purchased by the Defendant and Moreno were of a similar make and model to those reported stolen by the Defendant in July. Additionally, special agents reviewed the body camera footage from the WCSO Deputy, in which the Defendant stated he was a "gun addict." A review of the footage also revealed that Zamora, a prohibited person, was on the ranch during the time in which the complaint was made.

All this information was known to ATF before they initiated the surveillance operation on August 25, 2021. During the course of their surveillance, agents at the Sierra Gorda residence observed the Defendant—who previously told special agents at the Exxon gas station he was going to court—arrive at the residence and go inside. Agents then noticed movement inside the garage and observed what appeared to be people bringing objects to vehicles parked nearby and placing them inside, before going back into the residence. At various points, agents observed the Defendant, Zamora, Sanchez, and Covarrubias entering and exiting the residence. Agents subsequently observed these four individuals leave the property in different vehicles but appearing to travel together.[18] Then, Special Agent Insley, surveilling the Quail Hollow residence, observed Covarrubias, Zamora, and the Defendant arrive in their separate vehicles and meet up. Initially, the Defendant went inside while Covarrubias and Zamora walked over to the Chevrolet pickup truck. The garage door then opened, and the Defendant walked over to the truck and pulled out a tan AR-type firearm and a black rifle bag.

What the record and evidence show are all the facts collected by law enforcement leading up to August 25, 2021, as well as the observations made at both Sierra Gorda and Quail Hollow that day. Based on the totality of the circumstances, the officers possessed a well-founded basis to

---

[18] *See* R. & R. at 28, fn. 32, which provides examples as to both reasonable suspicion and probable cause. Of import, all the cited cases conclude that, even though law enforcement did not directly observe an illegality, that does not preclude a finding of reasonable suspicion or probable cause.

conclude the Defendant and others were partaking in criminal activity.[19] That basis alone is sufficient under the law, as the officers are not required to justify a belief that a particular crime has been or is about to be committed. *United States v. Pack*, 612 F.3d 341, 353-57 (5th Cir. 2010) (synthesizing authority and concluding that detention need not be justified by suspicion of a particular, specific crime). Rather, the circumstances in this case present themselves as such that the officers could reasonably suspect some legal wrongdoing. *Id*; *see also United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) ("Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.").

Along with the above, the Government agrees with and incorporates into its response the findings made by the Magistrate Court. R. & R. at 19-34. Specifically, the Government would highlight the following portion of the Report and Recommendation

> Connecting these "specific and articulable" facts surrounding the circumstances of the incomplete theft report, Amaro's inconsistent itinerary, the observations at Sierra Gorda followed by direct travel to Quail Hollow, ending with Amaro's unloading of firearms at Quail Hollow while watched by Covarrubias, the Court agrees that, in the totality of the circumstances and in light of the agents' training and experience, the agents had reasonable suspicion that criminal activity was afoot when they detained Amaro and Covarrubias.31 *See United States v. Moncivais*, 848 F.3d 353, 357 (5th Cir. 2017) (reasonable suspicion examined in the totality of the circumstances in the situation at hand and in light of the officers' own training and experience). Although Defendants attempted to conjecture through cross-examination of the agents that the movement of people and vehicles at Sierra Gorda could be attributed to the unloading of groceries (*see* Def. 2 Ex. 5-4), and persons convening for Covarrubias's business, the agents can "make commonsense judgments and inferences about human behavior," and they "need not rule out the possibility of innocent conduct." *Thomas*, 997 F.3d at 610

---
[19] The Government, in its response to the Defendant's Motion to Suppress, included briefing on the three levels of a police encounter (consensual, investigatory detention, and arrest). *See* Dkt. No. 179 at 10-13. The Government would incorporate that briefing into its response here.

29

> (international citation and quotation marks omitted); *see United States v. Chavez-Villareal*, 3 F.3d 124, 126-07 (5th Cir. 1993) ("We assess the basis for a stop not by isolating any component factor, each of which may indicate wholly innocent behavior standing alone, but by examining the entire picture, which must yield articulable and objective manifestations of particularized suspicion."). Circumstantial evidence alone can be sufficient for a finding of reasonable suspicion of criminal activity, and even for probable cause.

R. & R. at 27-28. In summation, Defendant's claim that, "A reasonable suspicion analysis is inapplicable in this case and cannot save the unlawful entry…" ignores the overwhelming evidence which reaches the opposite conclusion. Def. Obj. at 9.

### c.  Scope of Detention

The Defendant objects to the Magistrate Court's finding that the scope of the Defendant's detention was reasonable. Def. Obj. at 9-10. The Government agrees with and incorporates into its response the findings by the Magistrate Court that the continued detention of the Defendant was reasonable. R. & R. at 31-34. As the Magistrate Court noted, the officers were in a "hostile and quickly developing situation," and the officers did not act unreasonably under the circumstances. R. & R. at 31. Additionally, the agents became aware that more firearms were inside the house, and that Zamora had yet to come out. *Id*. As the Magistrate Court pointed out, "The officers only paused their efforts briefly when Covarrubias suggested a peaceful, less-dangerous method for removing the barricaded suspect—a phone call by Covarrubias. Zamora existed the residence and was taken into custody by the agents without further incident at approximately 2:04 p.m." R. & R. at 32. Finally, the Magistrate Court concluded the following:

> In the span of the next thirty-five minutes, the agents performed a protective sweep and searched the Quail Hollow residence; obtained consent from Covarrubias to search the Silverado, and searched it; managed the arrival of Amaro's parents and handled the potential domestic dispute situation they presented; obtained consent from Amaro to search his bedroom and gun safe. This brief investigation

verified their suspicions of illegal firearms transfers. *See United States v. Bell*, 480 F.3d 860 (8th Cir. 2007) (finding that during investigation of illegal possession of stolen handguns and assault rifles with possibility of firearms inside vehicle officers' actions were reasonably necessary to maintain status quo, protect themselves, and allow a limited search of vehicle immediately and without interference). But for the barricade situation, "only a short and certainly permissible pre-arrest detention would likely have taken place." *Sharpe*, 470 U.S. at 688. It was during this last event, while Amaro was accompanying Johnson during the search of the gun safe and his bedroom, that Covarrubias was moved from the driveway, handcuffed, and placed in the patrol unit at 2:41 p.m. (Dkt. 254 at 3); *see Campbell*, 178 F.3d at 349-50 (finding that investigative detention not converted into arrest when officers leave suspect handcuffed during time it takes to investigate another suspect). In light of all the family members on-scene, it was not unreasonable to move Covarrubias away from the residence and place him in a patrol unit when Johnson began to question Amaro during the search of the gun safe and bedroom.

R. & R. at 32-33. Ultimately, the Court determined—and the Government agrees—that the situation was one which "exemplified a graduated response to emerging facts,"[20] and that the agents' actions were responsive to evolving conditions without "purposeful prolongation." R. & R. at 33. The agents did not act unreasonably in their efforts, and there is no evidence "the officers were dilatory in their investigation." *United States v. Sharpe*, 470 U.S. 675, 687 (2011); *see also* R. & R. at 34.

Defendant next objects to the characterization there was a barricade situation at Quail Hollow. The Government would refer to Section III(A)(vii) of its response, which addresses the ongoing situation at Quail Hollow and concerns of the agents on-scene. Again, the Government agrees with and incorporates into its response the findings of the Magistrate Court, which correctly concluded there was a barricade situation at Quail Hollow.

---

[20] R. & R. at 33[20] (quoting *United States v. Brigham*, 382 F.3d 500, 509(5th Cir. 2004)).

Defendant argues that Zamora was not hiding within the house and had no duty to come out. The Government would again refer to the testimony of Special Agent Insley (Sections II(G) and III(A)(v)) as to the events occurring at Quail Hollow that day. Ultimately once the agents were on-scene and firearms seen being moved into the home, the agents became aware that more firearms were inside, and that a prohibited person had access to them. The same individual who, earlier in the day, had been at Sierra Gorda helping move what the agents suspected to be firearms. This same evidence would also negate Defendant's claims there was no "exigency" or "aggravating factors." Def. Obj. at 10.[21]

### iii. Probable Cause to Arrest – False Acquisition of Firearms

Defendant objects to the Magistrate Court's conclusion the Defendant was not arrested until he was transported to the ATF office. Def. Obj. at 10-11. The Government would refer to Section III(B)(ii)(b-c) of its response which outlines that law enforcement engaged in a lawful investigatory detention of the defendants while they were on-scene at Quail Hollow.

Additionally, the Government agrees with and incorporates into its response the findings by the Magistrate Court. R. & R. at 28-34. This section of the Report and Recommendation details not only the timeline of events, but how the law supports the continuation of the investigatory detention, and that the detention did not morph into an arrest until probable cause was found via the search of the Defendant's gun safe and his inculpatory statements, at which time the defendants were transported to Walker Plaza.

---

[21] Defendant alleges law enforcement created an exigency when "they arrested Amaro without a warrant within his garage…" Def. Obj at 9-10. Again, the facts, evidence, and record created at the hearings indicate otherwise. The agents did not arrest the Defendant until 2:51 p.m. on the 25th and, before that time, were conducting a lawful investigative detention. There was also no warrantless search of the Quail Hollow residence that would require the presence of exigent circumstance. *See United States v. Richard*, 994 F.2d 244 (5th Cir. 1993) (presence of exigent circumstances needed to justify warrantless and nonconsensual search of someone's home) Further, soon after the detention of the Defendant, law enforcement obtained consent to search from Corina Valdez (the property's owner). Special Agent Johnson also obtained consent from the Defendant to specifically search his safe and bedroom as well. After obtaining consent from two different people, law enforcement then entered the home.

Defendant next objects to the Magistrate Court's finding that agents had probable cause to arrest the Defendant for making false statements in the purchase of firearms.[22] The Government would refer to Section III(B)(ii)(b) of its response, which summarizes the scope of the investigation by law enforcement and the information collected prior to August 25, 2021, as well as the surveillance operation that occurred that day.

Ultimately, based on the collective knowledge of ATF and law enforcement involved in the investigation—and prior to any statements made by the Defendant during the search of the gun safe and bedroom—probable cause had been established the Defendant engaged in the acquisition of at least one firearm by making materially false statements at the time of purchase. *See* 18 USC §§ 922(a)(6) and 924(a)(1)(A). The Magistrate Court concurred with this argument, which the Government would incorporate into its response. R. & R. at 35-36.[23]

### iv. <u>Probable Cause to Arrest – Transferring Firearms to Prohibited Person</u>

Defendant objects to the conclusion that probable cause already existed to arrest the Defendant for transferring or disposing of a firearm to a prohibited person. Def. Obj. at 12. The Government agrees with and incorporates into its response the findings of the Magistrate Court, which determined the following:

> There is a significant probability that Amaro was aware of Covarrubias's prohibited status as a felon, given that Amaro was his younger brother, worked for him, had claimed ownership of dozens of firearms reportedly stolen from his ranch, and was suspected of lying about having the recently acquired rifles in his possession and of removing them from Sierra Gorda. Amaro was the complainant on the Sheriff's Office theft report of 30

---

[22] The Government, in a supplemental response to the motions to suppress, included briefing on whether probable cause existed prior to the surveillance operations on August 25, 2021. *See* Dkt. No. 257 at 2-4. The Government would incorporate the aforementioned briefing into its response here.

[23] Defendant argues Special Agent Insley had "no intention of arresting Amaro for violations of law identified by the Court." Def. Obj. at 11. However, as the Magistrate Court pointed out, probable cause is an objective judicial inquiry. See R. & R. at 36, fn. 37 ("However, probable cause is an objective judicial inquiry, and is a legal standard wholly distinct from charging discretion." (citing *United States v. Ho*, 94 F.3d 932, 935-36 (5th Cir. 1996)).

semi-automatic AK-47 and AR-15 style rifles but could not supply additional detailed information about those firearms he allegedly owned. On August 25, when asked where he stored his three most recently purchased firearms, Amaro told agents that he kept them at Quail Hollow, then immediately drove to Covarrubias's house, participated in what appeared to be an elaborate load-up. He then went straight to Quail Hollow where he unloaded at least two rifles (one tan rifle and one in the rifle case), and was seen putting three rifles (two rifles and one in the rifle case) into the gun safe—the same number and type of rifles that supposedly should have been stored at Quail Hollow all along. That Amaro was compelled to lie to the agents about having *his* firearms stored in *his* gun safe at Quail Hollow, and then concocting a cover story to postpone verifying that he had the firearms in his custody only to later be suspected of removing those same firearms from Covarrubias's residence at Sierra Gorda, supports a probability that Amaro knew that he, rather than Covarrubias, needed to maintain custody and possession of the firearms. Moreover, agents knew that Amaro was a twenty-year-old relative of Covarrubias who was making large and expensive purchases of firearms.

R. & R. at 37-38 (emphasis original). Prior to August 25, 2021, there was probable cause[24] to believe the Defendant was guilty of disposing of a firearm to someone he either knew or had reasonable cause to believe was prohibited from such possession. *See* 18 USC § 922(d).

> v. Defendant's Consent to Search

Defendant objects to the Magistrate Court's finding his consent to search his safe and bedroom were voluntary. Def. Obj. at 13-15.[25]

In considering whether consent was voluntary, courts in the Fifth Circuit consider six factors, "all of which are relevant, but no one of which is dispositive or controlling." *United States*

---

[24] *See United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010) ("Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that evidence bearing on that offense will be found in the place to be searched." ).

[25] The Government, in its response to the Defendant's Motion to Suppress, included briefing on the issue of the voluntariness of consent to search. *See* Dkt. No. 179 at 13-15. The Government would incorporate that briefing into its response here.

*v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002). These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Jenson,* 462 F.3d 399, 406 (5th Cir. 2006).

As it relates to the first factor, the defendant was being detained and in handcuffs at the time in which Special Agent Johnson approached him about consent. However, there is no indication of any coercion on the part of the special agent, or any other law enforcement official. At no point did Special Agent Johnson ever raise his voice or yell, nor did he ever brandish a weapon.[26] Additionally, the Defendant fully cooperated with law enforcement. He not only consented to a search of his gun safe and bedroom, but thereafter provided law enforcement with helpful information linking other individuals (and himself) to suspected offenses. Further, the Defendant never withdrew consent during the search. The fourth factor also points to voluntariness, as Special Agent Johnson read the consent form which noted, (1) the Defendant had the right to refuse to give consent to search and demand that a search warrant be obtained; (2) that any contraband or evidence of a crime found could be seized and used against him; (3) that he could consult with an attorney before or during the search; and (4) that he could withdraw consent at any time. See Gov. 2 Ex. 5. The fifth factor also points to voluntariness, as the evidence shows there was no communication barrier, and the Defendant understood the nature and possible consequences of consenting to the search.

---

[26] Prior to even reading the consent form, Special Agent Johnson asks the defendant where he went to high school, at which point the two discuss playing football.

Based on the totality of the circumstances, the defendant was never coerced or deceived, and was treated courteously by law enforcement. He was fully aware that he not only had the right to refuse consent, but that he could also withdraw it at any time.

Along with the above, the Government agrees with and incorporates into its response the findings of the Magistrate Court. R. & R. at 40-43. The Magistrate Court reviewed the six factors promulgated by the Fifth Circuit and determined the Defendant's consent was voluntary. The Magistrate Court found that most of the six factors weighed in the Government's favor. While the Defendant's detention was involuntary, there was no evidence of coercive procedures, the Defendant cooperated and assisted in the search, the Defendant was informed multiple times of his right to refuse consent, and the Defendant's education and intelligence were such there would be no issues with understanding the nature of consent. Ultimately, "[b]ased on the totality of the circumstances, considering especially the signed consent form, the level of cooperation shown by Amaro, and the lack of Government coercion, the Court finds that Amaro voluntarily consented to the search of his gun safe and his bedroom." R. & R. at 43.

vi. <u>Fifth Amendment Issues</u>

Lastly, the Defendant objects to the Magistrate Court's finding his confession was not tainted by a Fourth Amendment violation. Def. Obj. at 15-18. The Government would refer to the preceding sections of its response and again argue that, for all the aforementioned reasons, there was no Fourth Amendment violation. The Defendant was the subject of an investigatory detention supported by reasonable suspicion, and the scope of the detention was reasonable. Further, even before the events that transpired on August 25, 2021, law enforcement had probable cause to arrest the Defendant for violations of 18 USC § 922.

Additionally, the Defendant's waiver of rights was voluntarily, knowingly, and intelligently made.[27] Here, shortly after Special Agent Johnson received consent from the Defendant to search the gun safe and his bedroom, he advised the Defendant of his *Miranda* rights via ATF's "Advice of Rights and Waiver" form. After reading the form to the Defendant, Special Agent Johnson told the Defendant he had an obligation to inform him of his rights and that he was being detained. Special Agent Johnson then asked if the Defendant understood his rights and if he was willing to speak to the defendant, and the Defendant agreed to both. As the Defendant began to initial next to each line on form, Special Agent Johnson stated, "and I just want to make sure you understand, you understand these rights, correct?" The Defendant reiterated that he understood, initialed next to each line on the form, and then signed and printed his name. The Defendant then asked if he was under arrest, at which point Special Agent Johnson told him there was an ongoing investigation and they (law enforcement) were still collecting facts. Special Agent Johnson then told the Defendant that, because the government was detaining him, he had a right to be told he can remain silent, that he could ask for an attorney, and that for "self-incrimination purposes, the 4th and 5th Amendment right, that's why I'm advising you and I want to make sure you understand those rights." The Defendant again stated he understood his rights.

The decision to speak to ATF was the result of a free and deliberate choice made on the part of the Defendant, without any coercion or deception on the part of law enforcement. There is no evidence that he was suffering from any mental or physical impairments at the time of the interview. The Defendant was not in handcuffs during the time in which he was advised of his rights. Special Agent Johnson conversed with the Defendant in the English language, which the

---

[27] The Government, in its response to the Defendant's Motion to Suppress, included briefing on the issue of the voluntariness of consent to search. *See* Dkt. No. 179 at 15-19. The Government would incorporate that briefing into its response here.

Defendant stated he preferred to speak in. The Defendant was advised of his *Miranda* rights off an official ATF form. After being read the form, Special Agent Johnson emphasized to the Defendant that he wanted to make sure the Defendant understood his rights. The Defendant confirmed that he understood those rights, waived them, and agreed to answer questions. Additionally, even after the Defendant signed the waiver form, Special Agent Johnson not only restated the *Miranda* rights, but proceeded to explain to the Defendant why he had the right to be informed of them.

Along with the above, the Government agrees with and incorporates into its Response the findings by the Magistrate Court. R. & R. at 55-59. As to Defendant's first contention that he was interrogated and questioned in the garage, the facts, evidence, and law establish otherwise. The Defendant was subject of an investigatory detention, which is a "well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); R. & R. at 20-21 (outlining a *Terry* stop). Additionally, the Magistrate Court addressed this issue in its Report and Recommendation:

> The Court notes that Amaro argued in his brief, but not at the hearing, that he was subject to custodial interrogation before he provided consent to search at Quail Hollow. (Dkt. 162 at 13.) Not so. Amaro was not in custody when Insley queried him at the driveway prior to his detention. *See United States v. Bass*, 996 F.3d 729, 740 (5th Cir. 2021) ("Miranda procedural safeguards attach only where there has been such a restriction on a person's freedom as to render him 'in custody.'") The Court has already reviewed how the circumstances surrounding the few minutes during which Insley spoke with Amaro on the driveway prior to his seizure was a non-custodial encounter. Moreover, since Defendant does specify which other unwarned statement is suspect, the Court could identify only one question that Johnson asked *after* Amaro provided consent to search the gun safe and his bedroom *but just before* Amaro waived his rights. Johnson asked Amaro "do you have any firearms inside the house or anything else like that?" as they readied to begin the search. (Gov. 2 Ex. 8 at 6:30.) Johnson then read Amaro his rights, and asked if there were firearms inside of the house for "officer safety," "to make sure there was nothing that could hurt us." (*Id.* at 9:18-30). By this mere question, Johnson was not interrogating

Amaro because Amaro could legally possess firearms, and his response to this single question was not reasonably likely to elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (defining what constitutes "interrogation" in *Miranda* safeguards).

R. & R. at 58, fn. 45 (emphasis original).

Lastly, and as the Magistrate Court included in its Report and Recommendation, the recording of the Defendant at Walker Plaza showed the Defendant was offered water after he complained of being dizzy. R. & R. at 58; Hr'g 2 at 3:18-19. That same recording, entered into evidence as Gov. 2. Ex. 7, further demonstrated the Defendant was alert, responsive, and not the subject of any coercion or physical/verbal threats. The Defendant also did not request any medical attention. Lastly, even any legally incorrect statement to the Defendant that he was being detained rather than under arrest would not invalidate the waiver of rights form. R. & R. at 58-59 (citing *United States v. Tapp*, 812 F.2d 177, 178-79 (5th Cir. 1987).

## IV. CONCLUSION

Here, the Government presented a total of six witnesses, two days of testimony, and over thirty exhibits. The testimony and evidence were presented before a Magistrate Court, who listened to the witnesses and reviewed the exhibits. Then, over the course of seventy pages, the Magistrate Court explained in detail how the application of the law to the facts of this case led to the conclusion no constitutional protections were violated. The Defendant, in turn, filed a series of objections unsupported by the record or evidence, and which largely restated the same claims submitted to the Magistrate Court. The Magistrate Court found those arguments to be unavailing, unpersuasive, and unsupported by the law; the Government believes the District Court should reach the same conclusion.

For the foregoing reasons, the Government requests this Court overrule all objections made

by the Defendant and adopt in its entirety the Magistrate Court's Report and Recommendation.

Respectfully submitted,

Alamdar S. Hamdani
United States Attorney

By: _____
Brian Bajew
Assistant United States Attorney


_____
Mark A. Hicks
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that, on February 24, 2023, a true and correct copy of the Government's Response to Defendant's Objections to the Magistrate Judge's Report and Recommendation was electronically filed with the Clerk of the Court using the CM/ECF system, which will transmit notification of filing to all counsel of record.

Brian Bajew
Assistant United States Attorney

Mark A. Hicks
Assistant United States Attorney